UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN MARK HALCOMB, #191295,

       Petitioner,

                              CASE NO.  4:11-CV-11097
v.                            HONORABLE GERSHWIN A. DRAIN

GREG MCQUIGGIN,

       Respondent.
_____/

**OPINION AND ORDER DISMISSING THE PETITION FOR A WRIT OF
HABEAS CORPUS, DENYING A CERTIFICATE OF APPEALABILITY,
AND DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL**

**I.    Introduction**

Michigan prisoner John Mark Halcomb ("Petitioner") has filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction for first-degree felony murder, MICH. COMP. LAWS § 750.316, which was imposed following a jury trial in the Livingston County Circuit Court.  Petitioner was sentenced to life imprisonment without the possibility of parole in 1987.  In his pleadings, Petitioner raises claims concerning the presentation of allegedly false testimony and the effectiveness of trial counsel.  Respondent has filed an answer to the petition contending that it should be dismissed for failure to comply with the one-year statute of limitations applicable to federal habeas actions, based upon procedural default, and/or for lack of merit.  Having reviewed the matter, the Court concludes that the petition is untimely under 28 U.S.C. § 2244(d) and must be dismissed.  The Court also concludes that a certificate of appealability and leave to proceed *in forma pauperis* on appeal should be denied.

**II.    Facts and Procedural History**

Petitioner's conviction arises from a larceny, kidnapping, and murder that occurred in Fowlerville, Michigan on December 16, 1986. The Michigan Court of Appeals described the facts, which are presumed correct on habeas review, 28 U.S.C. § 2254(e)(1); *Wagner v. Smith*, 581 F.3d 410, 413 (6th Cir. 2009), as follows:

> This case involved the murder of 41-year-old Charles Brown, who was six-feet tall and weighed 260 pounds. It was undisputed that defendant and Lessie Brown, Charles' wife, were having an affair. The prosecutor's theory of the case was that defendant and Lessie Brown planned to kill Charles Brown and make it appear as though the killing had occurred during the course of a robbery of the pizzeria where Lessie Brown worked.
>
> On December 16, 1986, defendant called the Brown residence. Lessie Brown worked that night at the pizzeria. She was the last employee to leave and was in charge of the cash receipts for the day. Charles Brown was to pick up his wife when the pizzeria closed as he always did. Brown was seen at the pizzeria by another employee when she left at 10 p.m.
>
> Brown's body was discovered 1.8 miles from the pizzeria on the side of the road. His hands were handcuffed behind his back. Brown had been handcuffed while he was alive. He had been stabbed nineteen times, although he suffered only seventeen wounds. Two wounds were in his kidney area; the remainder, in his back and neck. Brown's body had bruises on it consistent with it being thrown from his van. Brown had bled excessively. Brown's wallet was found with his body and contained $43. Brown also had an empty knife sheath, which could hold a 3-inch folding-style knife. We note that Brown was a strong man, having worked on an assembly line and having placed 85- or 40-pound bumpers on cars at the rate of forty per hour for ten hours each day. Lessie Brown was 5-feet, 3- or 4-inches tall and was stocky.
>
> Approximately $775 was missing from the pizzeria and there were no signs of forced entry. When the police searched the Brown van, they found a hunting knife in the van's front console. They also found Lessie Brown's purse, which contained $25.60 and a folding-style knife. The police also discovered two pieces of what appeared to be a latex glove in the van; one was in a pool of blood.
>
> Defendant had handcuffs and surgical gloves in his apartment. Defendant lived in Ypsilanti; the pizzeria was in Fowlerville. On the night of the alleged murder, defendant borrowed a car from one of his other girlfriends telling her that he would return it in one hour. Defendant then drove to another friend's house. Defendant asked the friend to go to his apartment for drinks and, later, to accompany him to purchase some drugs in Howell. The pair drove to the pizzeria in Fowlerville.

Defendant told his friend that he was meeting someone in a van. Defendant told the friend to follow the van if it left the parking lot; however, defendant took his friend to a spot where defendant would meet him if he lost the van.

Defendant's friend did see the van drive away, but he lost it in the foggy night. Defendant's friend went to the designated spot and waited for defendant to arrive. When defendant arrived in the van, defendant's friend asked him what had happened and defendant stated: "You don't want to know."

The pair then drove back to defendant's apartment, where defendant changed his clothes. Defendant then borrowed some gasoline from his friend and they drove to a secluded area, where defendant burned his clothes as well as what appeared to be a knife sheath. During the evening, defendant's friend did not see blood on defendant and he did not see defendant carrying any weapons, handcuffs or surgical gloves.

We note that the police found footprints in the snow 4/10ths of a mile from where the body was found and also found some soap.

Defendant took his friend home and then returned the car to his girlfriend's house, where he spent the night. That night, defendant gave his girlfriend $40 for a room which they had planned to rent after her Christmas party. Defendant took his girlfriend out to breakfast the next morning and gave her $20 when she took her car through the car wash. When the girlfriend asked defendant where he had gotten the money, he jokingly replied: "I iced somebody." Defendant then paid his telephone and Edison bills and obtained money orders to pay his rent and a parking ticket.

The manager of defendant's apartment building, which was subsidized housing, testified that defendant paid his rent and also flipped through a large amount of money to pay her $10 for a lock change.

Defendant also went Christmas shopping with his brother-in-law and purchased a ring for his girlfriend, which cost over $100, and a food processor for his sister. Defendant had to borrow some money from his brother-in-law to pay for the food processor.

After defendant was questioned by the police, he called his brother-in-law and asked to meet him. Eventually, they went to defendant's brother-in-law's house where defendant told him that he was seeing a woman and got into her van. At that time, the woman's husband appeared. The man and his wife began to argue. The man told defendant to sit down and continued to argue with his wife. Defendant attempted to leave the van and the man hit him in the face, cutting the inside of his mouth and knocking him to the back of the van. When defendant looked up, the man was coming at him with a ten-inch knife. Defendant got the knife away from the man and tried to get out of the van. The man then grabbed defendant from behind and

>defendant slashed him with the knife. When defendant turned, the man had let him go and defendant saw the man holding his midsection. Defendant saw blood, panicked, and ran. Defendant took the knife with him and, later, threw it away.
>
>On December 18, defendant and his brother-in-law picked up defendant's girlfriend. They went to an attorney's office. After defendant's brother-in-law went into the office, defendant asked his girlfriend if she loved him and would do anything to protect him. When she responded affirmatively, he showed her a legal pad with writing on it and asked her to read and memorize the first page.
>
>Thereafter, the trio went to defendant's brother-in law's house where defendant's brother-in-law vacuumed defendant's girlfriend's car and washed the door panels with alcohol to remove any fingerprints. Defendant had told his brother-in-law that there was cocaine dust in the car and that he did not want his girlfriend to get in trouble. Defendant also noted that the fingerprints of another person might be in the car.
>
>Later on the 18th, when defendant's brother-in-law was taking him to the sheriff's department, they stopped at a restaurant and defendant picked up a newspaper. Defendant saw an article about a kidnapping and murder in Fowlerville on the front page. Defendant became extremely upset and said: "That can't be. It just can't be. The guy wasn't dead."
>
>One of defendant's former roommates testified that defendant asked him if bullets could be traced to a particular gun in mid-December. Defendant's friend testified that defendant stated that a hunting accident would be a way of getting rid of a girlfriend's husband.
>
>We note that the week after the robbery, defendant's girlfriend found some change rolls in a boot in her bathroom. She gave the rolls to the police. We also note that on December 12, defendant's girlfriend insisted on going with him when he asked to borrow her car. She was suspicious that defendant was engaged in drug transactions because he was putting so many miles on her car. At that time, defendant drove to the pizzeria. Defendant went inside and got the pizza. Defendant told his girlfriend that the drugs were hidden in the pizza box.

*People v. Halcomb*, No. 106912, pp. 1-5 (Mich. Ct. App. March 16, 1989).

At the close of trial, the jury convicted Petitioner of two counts of felony murder with kidnapping and larceny as the underlying felonies, kidnapping, and larceny over $100.00. The trial court sentenced him to life imprisonment without the possibility of parole on the felony murder

conviction with kidnapping as the underlying felony, 70 to 140 years imprisonment on the kidnapping conviction, and 3½ to 5 years imprisonment on the larceny conviction.

Petitioner filed an appeal of right with the Michigan Court of Appeals, raising claims concerning the admission of hearsay testimony and double jeopardy. The court vacated his kidnapping and larceny convictions and sentences on double jeopardy grounds, but affirmed his felony murder conviction and sentence. *Id*. Petitioner filed an application for leave to appeal with the Michigan Supreme Court, which was denied in a standard order. *People v. Halcomb*, No. 85765 (Mich. S. Ct. Oct. 31, 1989).

In 1993, Petitioner filed a motion for relief from judgment with the state trial court raising claims concerning the jury instructions, the conduct of the prosecutor, the admission of evidence, cumulative error, and the effectiveness of trial and appellate counsel. The trial court denied the motion, finding that Petitioner failed to establish cause and prejudice under Michigan Court Rule 6.508(D) and had not shown that appellate counsel was ineffective. *People v. Halcomb*, No. 87-4894-FC (Livingston Co. Cir. Ct. Jan. 9, 1995). Petitioner filed an application for leave to appeal with the Michigan Court of Appeals, which was dismissed as untimely under Michigan Court Rule 7.205(F)(3). *People v. Halcomb*, No. 195018 (Mich. Ct. App. Oct. 7, 1996). Petitioner did not seek leave to appeal in the Michigan Supreme Court.

On February 4, 2000, Petitioner filed a motion in the state trial court requesting court documents and transcripts. The trial court denied the motion, finding that Petitioner had previously been given the materials and had failed to demonstrate good cause for another copy. *People v. Halcomb*, No. 87-4894-FC (Livingston Co. Cir. Ct. April 25, 2000). Petitioner filed an appeal with the Michigan Court of Appeals seeking the materials, which was denied for lack of jurisdiction and

for being untimely. *People v. Halcomb*, No. 227911 (Mich. Ct. App. July 19, 2000). Petitioner did not seek leave to appeal in the Michigan Supreme Court.

In September of 2000, Petitioner filed a delayed application for leave to appeal with the Michigan Court of Appeal concerning the trial court's denial of his request for documents and transcripts. In lieu of granting leave to appeal, the court vacated the trial court's order and remanded for reconsideration of the request for the materials finding that Petitioner had made a prima facie showing that the materials were lost during a prison transfer. *People v. Halcomb*, No. 229800 (Mich. Ct. App. April 27, 2001). According to Petitioner, the trial court complied with the order and provided him with the requested materials in 2001.

On February 20, 2009, Petitioner filed a second motion for relief from judgment with the state trial court raising the same false testimony and ineffective assistance of trial counsel claims presented on habeas review. The trial court denied the motion, finding that Petitioner had not shown cause and prejudice under Michigan Court Rule 6.508(D)(3) for his failure to raise the claims on direct appeal and that Petitioner had not shown that the prosecution presented false testimony and/or that any false testimony would have affected the verdict. *People v. Halcomb*, No. 87-4894-FC (Livingston Co. Cir. Ct. April 1, 2009). Petitioner filed a delayed application for leave to appeal with the Michigan Court of Appeals, which was denied "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Halcomb*, No. 296470 (Mich. Ct. App. March 22, 2010). Petitioner filed an application for leave to appeal with the Michigan Supreme Court, which was similarly denied. *People v. Halcomb*, 488 Mich. 994, 791 N.W.2d 439 (2010).

Petitioner dated his federal habeas petition on March 12, 2011. Respondent filed an answer

6

to the petition on September 23, 2011. Petitioner filed a reply to that answer on October 20, 2011. The matter was reassigned to this district judge on December 14, 2012.

**III.    Discussion**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2241 *et seq.*, governs the filing date for this action because Petitioner filed his petition after the AEDPA's effective date. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). The AEDPA includes a one-year period of limitations for habeas petitions brought by prisoners challenging state court judgments. The statute provides:

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of--
>
>> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>>
>> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>>
>> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>>
>> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d). A habeas petition filed outside the proscribed time period must be dismissed. *See Isham v. Randle*, 226 F.3d 691, 694-95 (6th Cir. 2000) (dismissing case filed 13 days after the limitations period expired); *Wilson v. Birkett*, 192 F. Supp. 2d 763, 765 (E.D. Mich. 2002).

Petitioner's conviction became final before the AEDPA's April 24, 1996 effective date. Prisoners whose convictions became final before the AEDPA's effective date are given a one-year grace period in which to file their federal habeas petitions. *Jurado v. Burt*, 337 F.3d 638, 640 (6th Cir. 2003). Accordingly, Petitioner was required to file his federal habeas petition on or before April 24, 1997, excluding any time during which a properly filed application for state post-conviction or collateral review was pending in accordance with 28 U.S.C. § 2244(d)(2).

Petitioner filed his first motion for relief from judgment in state court in 1993 and the trial court denied relief on January 8, 1995. Petitioner did not timely appeal that decision to the Michigan Court of Appeals. Consequently, those proceedings did not delay the start of one-year grace period which began on April 24, 1996 and expired on April 24, 1997. Petitioner did not file his second state court motion for relief from judgment concerning his present claims until 2009. Thus, the one-year limitations period expired well before Petitioner sought state post-conviction review as to his habeas claims.[1] A state court post-conviction motion that is filed following the expiration of the limitations period cannot toll that period because there is no period remaining to be tolled. *Hargrove v. Brigano*, 300 F.3d 717, 718 n. 1 (6th Cir. 2002); *Webster v. Moore*, 199 F.3d 1256, 1259 (11th Cir. 2000); *see also Jurado*, 337 F.3d at 641. Furthermore, the AEDPA's limitations period does not begin to run anew after the completion of state post-conviction proceedings. *Searcy v. Carter*, 246 F.3d 515, 519 (6th Cir. 2001).

Petitioner has not shown that the State created an impediment to the filing of his federal

---

[1] The Court notes that Petitioner's motions for state court records and transcripts did not qualify as applications for post-conviction or collateral review so as to toll the limitations period under 28 U.S.C. § 2244(d)(2). *Johnson v. Randle*, 28 F. App'x 341, 343 (6th Cir. 2001); *accord May v. Workman*, 339 F.3d 1236, 1237 (10th Cir. 2003); *Lloyd v. VanNatta*, 296 F.3d 630 (7th Cir. 2002); *Hodge v. Greiner*, 269 F.3d 104, 107 (2d Cir. 2001).

habeas petition, nor has he shown that his claims are based upon newly-discovered evidence or newly-created retroactively-applicable rights which would warrant habeas relief. To the extent that Petitioner might assert a state-created impediment or newly-discovered evidence based upon the fact that he did not receive copies of state court records and transcripts until 2001, he cannot prevail. First, those materials were available at the time of his trial and/or appeal in the late 1980s and could have been discovered with reasonable diligence before the one-year grace period expired in 1997. Second, and more importantly, Petitioner offers no explanation to explain the delay from when he received the state records and transcripts in 2001 and when he filed his motion for relief from judgment in 2009. His petition is therefore untimely under 28 U.S.C. § 2244(d).

The United States Supreme Court has confirmed that the habeas statute of limitations is not a jurisdictional bar and is subject to equitable tolling. *Holland v. Florida*, _ U.S. _, 130 S. Ct. 2549, 2560 (2010). The Supreme Court has further verified that a habeas petitioner is entitled to equitable tolling "only if he shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Id*. at 2562 (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)); *see also Robertson v. Simpson*, 624 F.3d 781, 783-84 (6th Cir. 2010). A petitioner has the burden of demonstrating that he is entitled to equitable tolling. *Allen v. Yukins*, 366 F.3d 396, 401 (6th Cir. 2004). "Typically, equitable tolling applies only when a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control." *Jurado*, 337 F.3d at 642 (quoting *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 560 (6th Cir. 2000)).

Petitioner makes no such showing. The unavailability of transcripts or a delay in obtaining them is not a circumstance which justifies equitable tolling of a limitations period. *See Hall v.*

*Warden, Lebanon Correctional Inst.*, 662 F.3d 745, 750-51 (6th Cir. 2011) (citing cases); *Grayson v. Grayson*, 185 F. Supp. 2d 747, 751-52 (E.D. Mich. 2002) (citing cases). Additionally, Petitioner provides no explanation for the delay from when he received his state court records in 2001 and when he filed his state court motion for relief from judgment in 2009. Lastly, the fact that Petitioner is untrained in the law, is (or was) proceeding without a lawyer, or may have been unaware of the statute of limitations does not warrant tolling. *See Allen*, 366 F.3d at 403 (ignorance of the law does not justify tolling); *Rodriguez v. Elo*, 195 F. Supp. 2d 934, 936 (E.D. Mich. 2002) (the law is "replete with instances which firmly establish that ignorance of the law, despite a litigant's pro se status, is no excuse" for failure to follow legal requirements); *Holloway v. Jones*, 166 F. Supp. 2d 1185, 1189 (E.D. Mich. 2001) (lack of professional legal assistance does not justify tolling). Petitioner is not entitled to equitable tolling under *Holland*.

The United States Court of Appeals for the Sixth Circuit has held that a credible claim of actual innocence may equitably toll the one-year statute of limitations. *Souter v. Jones*, 395 F.3d 577, 588-90 (6th Cir. 2005); *see also Holloway*, 166 F. Supp. 2d at 1190. As explained in *Souter*, to support a claim of actual innocence, a petitioner in a collateral proceeding "must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley v. United States*, 523 U.S. 614, 623 (1998) (quoting *Schlup v. Delo*, 513 U.S. 298, 327-28 (1995)); *see also House v. Bell*, 547 U.S. 518, 537-39 (2006). A valid claim of actual innocence requires a petitioner "to support his [or her] allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness account, or critical physical evidence – that was not presented at trial." *Schlup*, 513 U.S. at 324. Furthermore, actual innocence means "factual innocence, not mere legal insufficiency." *Bousley*,

10

523 U.S. at 623. Petitioner makes no such showing. In fact, the materials concerning his co-defendant, which are attached to his petition, identify him as the person who killed the victim. Petitioner is not entitled to equitable tolling of the one-year period. His petition is untimely and must be dismissed.

## IV.     Conclusion

Based upon the foregoing discussion, the Court concludes that Petitioner failed to file his habeas petition within the one-year limitations period established by 28 U.S.C. § 2244(d), that he has not demonstrated entitlement to statutory or equitable tolling, and that the statute of limitations precludes federal habeas review of his claims. Accordingly, the Court **DISMISSES WITH PREJUDICE** the petition for a writ of habeas corpus.

Before Petitioner may appeal the Court's decision, a certificate of appealability must issue. *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court denies a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the court's assessment of the constitutional claim debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). When a court denies relief on procedural grounds without addressing the merits, a certificate of appealability should issue if it is shown that jurists of reason would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the court was correct in its procedural ruling. *Id.* Jurists of reason would not find the Court's procedural ruling in this case debatable. Accordingly, the Court **DENIES** a certificate of appealability. The Court also **DENIES** Petitioner leave to proceed *in forma pauperis*

on appeal because an appeal cannot be taken in good faith. *See* Fed. R. App. P. 24(a).

**IT IS SO ORDERED**.


May 8, 2013 /s/Gershwin A Drain
GERSHWIN A. DRAIN
UNITED STATES DISTRICT JUDGE